## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ALISON PALMER** *et al.,*
        **Plaintiffs,**


        **v.**


**CONDOLEEZZA RICE**,
        **Defendant.**

**Civil Action No. 76-1439 (HHK/JMF)**


**MARGUERITE COOPER** *et al.,*
        **Plaintiffs,**


        **v.**


**CONDOLEEZZA RICE**,
        **Defendant.**

**Civil Action No. 77-2006 (HHK/JMF)**


### REPORT AND RECOMMENDATION

**I.        BACKGROUND**

 By an Order dated January 19, 1989, this court found that the Department of State
("State") had discriminated against women in the administration of a written examination that
applicants for positions in the Foreign Service were obliged to take.  As part of the relief
awarded, it enjoined State from administering any written examination that had an adverse
impact upon women.

        In 2002, plaintiffs and State entered into a Consent Decree.  Pursuant to the decree, the
court certified as a class all female applicants who took, but did not pass, the 1991, 1992, 1993,

or 1994 Foreign Service Written Examinations.  The decree also permitted 390 members of the

plaintiff class to participate in the Oral Assessment phase of the Foreign Service application

process.  These women, referred to as the invitees, had the highest non-passing scores on the

1991-1994 examinations.

Under the Consent Decree, plaintiffs' counsel ("the Terris firm") were obliged to locate

the invitees and inform them of their legal rights.  Between February 1, 2002 and January 14,

2003, the Terris firm performed this task.  Plaintiffs now seek $155,706.55 in attorneys' fees and

$25,354.42 in costs[1] for work done during this period, the lion's share of which involved

contacting and locating the 390 sub-class members.

On April 14, 2004, I issued a Memorandum Opinion concluding that an evidentiary

hearing was necessary before I could determine the reasonableness of the fees sought.  Because it

appeared that lawyers and paralegals had performed the same work, there seemed to be a problem

of under-delegation.  There also appeared to be a problem of claiming fees for purely clerical

tasks that should not have been billed and should have instead been considered overhead.  See In

re Olson, 884 F.2d 1415, 1426-27 (D.C. Cir. 1989) (allowing fees for work done by clerks and

paralegals but disallowing compensation for "librarians, clerical personnel and other support

staff").  In addition, based on the entries themselves, I could not determine why the work that

was done required a lawyer's training and skill when similar work had been done by a paralegal.

_____

[1] In their original fee petition, plaintiffs sought $170,242.95 in attorney's fees and
$25,354.42 in costs.  On three separate occasions after submitting its fee petition to the court, the
Terris firm wrote off some of the time that they originally submitted for compensation in their fee
petition.  Plaintiffs first reduced the amount of fees sought in their reply brief.  Then, on July 15,
2004, plaintiffs again reduced the fees they sought, by approximately $8,000.  Finally, in August
2004, plaintiffs again wrote off an additional $1,000 in fees.

As a result, I ordered that an evidentiary hearing be held on several issues, as well as any

other factual issues addressed by the parties.  These issues included:

1.   What in fact did the lawyers do in the thirteen categories of
      work they specified, and why did what they did require a
      lawyer's training and skill?
2.   Was it necessary for the lawyers who billed at the highest
      rate to do the work they did in those categories of work
      where paralegals also worked?  Could the work have been
      delegated to more junior lawyers or even a paralegal?
3.   Would the market tolerate a lawyer's billing $100 for the
      services the paralegals performed or would it insist that
      those services were overhead that the lawyer would have to
      absorb?

Memorandum Opinion, Apr. 14, 2004, at 11-12.

The evidentiary hearing was held from August 17, 2004 until August 20, 2004.  Several

legal issues arose at the hearing, including whether additional witnesses would be allowed to

testify in a second phase of the hearing.  These issues have now been briefed and decided, and all

that remains is the ultimate determination of the parties' fee dispute.  After careful consideration

of the testimony and evidence offered by both parties, I have determined that plaintiffs are not

entitled to the full amount of the fees and costs they seek.  By the same token, it would be

inappropriate to deny them any compensation at all.  Accordingly, I recommend that the fees be

reduced for the reasons stated herein.

## II.   FINDINGS OF FACT

A.   The Search Process

1.   There are between 13,000 and 14,000 class members in this litigation, but

only 390 of these class members are women who, based on their

performance on the Foreign Service Written Examination, were invited to

3

take the Oral Assessment.  These 390 sub-class members, or invitees, are the women plaintiffs located during the time period of February 1, 2002 through January 14, 2003.

2.    The Terris firm had the obligation of notifying these women of the Consent Decree and their legal rights under the agreement.

3.    Until the invitees received copies of the Consent Decree, the women had no knowledge of the class action lawsuit.

4.    If plaintiffs' counsel failed to locate and notify an invitee of the lawsuit and the relief counsel had secured on behalf of the plaintiff class, she would lose her legal right to participate in the Oral Assessment.

5.    There were two key elements to the search: (1) determining the current address of each invitee, and (2) making contact with each invitee to verify that she was the woman that took the Foreign Service Written Examination in the early 1990s.

6.    On April 22, 2002, State provided plaintiffs' counsel with: (1) the names and mailing addresses of all class members, as provided by the individuals at the time of or during registration for the 1991, 1992, 1993, or 1994 Foreign Service Written Examinations; and (2) the names, dates of birth, social security numbers, and mailing addresses of the 390 invitees, as provided by these individuals at the time of or during registration for the 1991, 1992, 1993, or 1994 Foreign Service Written Examinations.

7.    Once the Consent Decree was granted preliminary approval by the court

4

on May 8, 2002, Monica Wagner ("Wagner"), a previous member of the Terris firm who worked extensively on this litigation and now serves as Of Counsel, directed paralegal David Ramirez ("Ramirez") to begin searching for two classes of women whose addresses (that had been provided by State) were likely to be inaccurate.  These categories of women were: (1) women whose addresses were clearly college addresses, and (2) women who had overseas addresses.

8.      Sarah Adams ("Adams"), an attorney with the Terris firm, was responsible for the daily management of the search process.  As of August 2004, she had never taken a deposition, argued before the court, or tried a case.  She did have previous experience searching for 1000 Bureau of Prisons employees.  This search, however, was quite different from the search at issue in this case, as illustrated by the following chart:

| Bureau of Prisons Employees | Palmer Invitees |
|---|---|
| Men | Women |
| Unlikely to have changed their names | Likely to have changed their names (*e.g.,* upon marriage) |
| Established in their careers | Recent graduates at time of the exam and last-known addresses |
| Less mobile | Interested in international work and therefore more likely to be mobile |
| Because a financial reward was at stake, class members had an incentive to reply | Because limited relief (the ability to submit to the Oral Assessment phase of an exam they had taken 10 years earlier) was available, they had less incentive to respond to correspondence |

9.      On May 23, 2002, the Terris firm, via a company called Alpha Graphics, mailed to all class members the Consent Decree and notice of the Fairness Hearing.  The letters were not sent via certified mail, nor was return

receipt requested.

10.   After receiving many phone calls in response to that letter, there was a second mailing, dated June 14, 2002, explaining that only the invitees would be entitled to relief.

11.   To facilitate the process of locating the 390 invitees and verifying their addresses, Ramirez created two databases: (1) a database of the entire class, and (2) a database of the 390 invitees.

12.   Once the database for the invitees was created, it was not consistently or adequately updated as the search progressed.

13.   At the same time, paper files were created for the women that were hard to locate, and search results were recorded in the paper files rather than the database.

14.   For these women, the Terris firm had a policy under which the attorneys and paralegals who followed up on leads for the hard-to-locate women could not search for a woman unless they had her case file.

15.   After the first mailing of May 23, 2002, approximately 35 women responded to the firm, and their addresses were verified.

16.   For women who did not respond to the first mailing, plaintiffs claim, and Ramirez testified at the hearing, that he conducted a social security number search on Lexis.  However, in his earlier deposition testimony, Ramirez testified that he did not perform any such searches.

17.   There is no evidence–via printouts of Lexis results or via transactional fees

6

billed by Lexis–that Ramirez performed social security searches on Lexis. There is only the testimony of various members of the Terris firm and Ramirez's own, self-contradicted testimony.  In addition, exhibits introduced at the hearing reveal that there were entries in the database which state: "Address updated on Lexis."  However, the Lexis printouts that appear in various search files indicate that the searches were not performed based on the women's social security numbers but on their names.  For example, the Lexis searches often took the following form: "jane w/2 doe."

18.     In light of this evidence, the court credits Ramirez's deposition testimony, discredits his hearing testimony, and finds that Ramirez never performed social security number searches on Lexis.

19.     Another mailing was sent out on July 10, 2002.  If an invitee responded to that mailing, she was marked as verified and her address was supposed to be updated in the database.

20.     Ramirez remembered that he was involved in stuffing many, many envelopes in connection with these mailings, but he does not remember whether he billed this task to the case or to the office.

21.     If the firm received no response from a particular woman, members of the firm used various Internet search engines, including google.com, yahoo.com, whitepages.com, verizon.com, and switchboard.com, in efforts to verify that they had her correct address and to determine whether there

was another way they could contact her.

22.   As of August 2, 2002, there were approximately 180 women for whom
      plaintiffs' counsel had been unable to verify addresses.  At that point,
      Kathy Skipper ("Skipper"), counsel for defendant, performed a Westlaw
      search for these individuals.

23.   Once the Terris firm received the Westlaw search results, they determined
      whether these addresses were new addresses.  If so, another letter was sent
      to each woman for whom they had secured a new address.

24.   Once again, if a woman responded, the database was supposed to be
      updated, and the search for that woman was completed.

25.   Throughout this time period, Adams, Ramirez, Carolyn Mozden
      ("Mozden"), and L.J. Fletcher ("Fletcher")–all employees of the Terris
      firm–continued to perform searches on the Web, looking for correct
      addresses and other ways to contact the invitees and verify that they were
      the correct individuals.

26.   Ramirez decided not to enter all of the information gleaned from phone
      calls or Internet searches into the database.  He also decided not to
      delegate any of the database work to secretaries because they were
      unfamiliar with the case and he would have had to review their work.

27.   During the course of the search, some invitees contacted the Terris firm,
      stating that they had already verified their contact information with the
      firm in the past and did not understand why they continued to receive

letters addressed to their former addresses (presumably because they were then forwarded to their current addresses).

28.    If Adams determined that all avenues had been exhausted in searching for a particular woman, the firm removed her from the list and replaced her name with an individual on the reserve list.

29.    The evidence indicates that the Terris firm searched extensively before deciding not to pursue a particular woman.  In one example, the invitee kept denying that she had ever taken the Foreign Service Written Exam, but the firm continued to make attempts to verify her identity.  After many searches, the firm finally confirmed that she was the woman who in fact took the Foreign Service exam in the early 1990s.  In other examples, members of the Terris firm pursued leads about prize-winning dogs, wineries, and weddings before giving up their quest to locate one of the 390 invitees and turning to the reserve list.

30.    By the search deadline, plaintiffs had achieved close to a 99 percent success rate in terms of contacting and verifying the invitees.  The Terris firm confirmed the identities of 385 out of 390 women.

31.    At no point did the Terris firm consult outside vendors to determine how much the search and verification process would cost if performed by a third party.[2]

---

[2]  At the hearing, plaintiffs cited paragraph 2(b) of the 2002 stipulated amendment to the protective order and argued that hiring a third-party vendor would have been prohibited by the terms of the order.  Paragraph 2(b) states:

B.      The Billing Records

1.      On three separate occasions after submitting its fee petition to the court, the Terris firm wrote off some of the time that they had originally submitted for compensation.  Plaintiffs first reduced the amount of fees sought in their reply brief.  Then, on July 15, 2004, plaintiffs again reduced the fees they sought, by approximately $8,000.  In a letter to defense counsel, plaintiffs' counsel explained each of the reductions, including approximately one-third of Ramirez's time in the Creating and Using Database Category because he expended more time than necessary to perform this work.  Finally, in August 2004, plaintiffs again wrote off an additional $1,000 in fees.  The result of these reductions was to reduce the attorney's fees sought from $170,242.95 to $155,706.55.

---

Access to the 1991-1994 examination information is restricted to . . . [a]ny person or entity whom plaintiffs' counsel determine is necessary, as consistent with the privacy considerations of class members, in order to obtain current addresses and contact information for the class members, with the following conditions:
(i) The information provided to that person or entity may consist only of the class members' [personal information] and the fact that she took the examination, but not whether she passed or did not pass the examination and her score on the examination; and
(ii) If the person or entity offers plaintiffs the option of limiting the use of the information to locating the class member for plaintiffs' counsel, plaintiffs' counsel shall exercise that option.

2002 Stipulated Amendment to the Protective Order Governing Handling of Personnel-Sensitive Information and Documents, ¶2(b).  In the court's view, this language certainly does not prohibit hiring an outside firm to perform the search for invitees and, in fact, contemplates that situation. Even if the language did prohibit disclosure of the invitees because they were the class members who performed best on the 1991-1994 examinations, the protective order could have been modified upon application to the court.

10

2.      Plaintiffs' fee petition included many vague billing records.

3.      As evidenced by many gaps in the time slip descriptions, plaintiffs' fee

petition included records that were not contemporaneously kept by the

timekeepers who were doing the work.  Many of these time records were

kept by Ramirez, whose original time slips were blank but were later filled

in before the fee petition was submitted to the court.  Ramirez testified that

no one asked him to provide descriptions of his time after he left the Terris

firm and before the fee petition was filed.

4.      There is some evidence that Ramirez started the search one month before

the Terris firm received the April 22, 2002 list of invitees and their

personal identifying information from State.  There is no indication that, at

that point, Ramirez had any idea of whom he was trying to locate.

5.      Wagner, a former member of the Terris firm that now serves as Of

Counsel, lives and works in Massachusetts.

6.      The firm seeks compensation for Wagner's time at full <u>Laffey</u> rates.

However, Wagner charges the firm at a rate of $85 per hour for her work.

She charges her Massachusetts clients at a rate of $140 per hour.

7.      Wagner attended the Fairness Hearing in Washington, DC because it was

the first substantive matter before Judge Kennedy and she had the requisite

background knowledge of the case.

8.      Wagner billed 5 hours of preparation and travel time on September 9,

2002 and 4 hours of travel time on September 11, 2002.  Both of these

entries were related to the Fairness Hearing.

9.  Wagner bills clients based in Washington, DC her full billing rate when she travels because she believes that to be the custom in Washington, but she bills her Massachusetts clients at 50 percent of the Massachusetts travel rate because that is the custom in Massachusetts and it is difficult for her Massachusetts clients to pay her fees.

10. Plaintiffs billed for certain fees and expenses, such as time billed for Wagner's travel and long distance telephone expenses, that were incurred solely because Wagner lives in Massachusetts.

11. Mozden is a junior attorney with the Terris firm. Most of her time entries were made before Mozden submitted her application to the D.C. Bar, although she was a member of the Maryland and Massachusetts bars at the time. Mozden has never taken a deposition or tried a case.

12. Fletcher is the Terris firm's office manager. She billed for 1.72 hours while "organizing and analyzing the status of invitees." She also billed 50.1 hours for time spent searching for and communicating with hard-to-locate invitees. When attempting to contact invitees based on these leads, she sent them emails from her company's email account: musiciansonque. She and the Terris firm consider the work she did to be paralegal work, and the fee petition seeks compensation for her work at a rate of $100 per hour.

13. There were inconsistent time records. For example, on a number of

occasions, one attorney billed for an intra-office communication with another attorney, but the other attorney did not bill for that same communication.

14.     Many time logs recorded time spent making telephone calls to other members of the Terris firm or to class members.  These logs often reflected that a certain amount of time was spent on a task, but the phone or email records indicate that the corresponding phone call lasted a significantly less amount of time or the email was very short.[3]  While Terris and other members of his firm explained that the additional time accounted for time spent related to the communications–such as retrieving and reviewing the case file, preparing for the communication, and memorializing the communication–none of these tasks was mentioned in the billing entries.

15.     Some members of the Terris firm billed according to 15-minute increments. Terris testified that he would bill according to the following guidelines:

a.     0 - 7 ½ minutes              Bill nothing

b.     7 ½ - 22 ½ minutes          Bill for 15 minutes

---

[3]  As for defendant's argument that there was no extrinsic evidence that some of these phone calls were ever made, the court will not require attorneys to offer such proof of each phone call.  In addition, plaintiffs' counsel have provided legitimate explanations of why an attorney may have billed for a certain call on a certain date, but no underlying phone bill was ever produced.  For example, plaintiffs never submitted expense reports for calls made by Terris while he was on vacation and in Israel, and Wagner made some calls not from her business phone but from other phone lines.  Other calls may have been incoming phone calls or local calls.

    c.       22 ½ - 37 ½ minutes          Bill for 30 minutes

Terris also testified that this method of billing resulted in lower fees for his clients because so much of his time was discounted.  In other words, whenever he worked in small chunks of time (less than 7 ½ minutes), the client would be billed nothing.

**III.    THE EXPERTS' OPINIONS**

    A.    <u>Plaintiffs' Expert, Jane Langston Ebert ("Ebert")</u>

        1.    Ebert, formerly a police officer, is a licensed private investigator who locates individuals in connection with civil and criminal cases.

        2.    She testified that searching via the Internet is a method that is recognized and used by others in her profession.

        3.    She also testified that, if she had been supplied with the information that plaintiffs' counsel received from the State Department, she would have:

            a.    Run a search on IRBSearch, which is a database to which she subscribes and which is only available to approved, licensed private investigators;

            b.    Then run a search on Lexis Nexis to gather any additional and more up-to-date information; and

            c.    Then used the 5551212 database, a database to which anyone can subscribe, to verify the information.

        4.    Ebert also testified that Westlaw and Lexis Nexis pull information from the same databases as IRBSearch.

5.      As for Ebert's fees, she charges a flat fee of $65 per search, but that fee

        does not include contacting the person or confirming the contact

        information produced via her search.

6.      The above search protocol yields a 65 percent success rate.

7.      If the results of the above search prove to be incorrect, a client can then

        pay for additional hourly searches at a rate of $65 per hour.  70 percent of

        these searches yield accurate results.

8.      If additional searches still do not yield a correct address, a client can hire

        Ebert to contact a confidential source, who charges approximately $200

        per search.  That process yields a 50 percent success rate.

9.      Ebert also testified that finding 390 women with addresses dating back

        between 8 and 11 years is a difficult search, but having the individuals'

        dates of birth and social security numbers is helpful.

10.     If a client were searching for 390 women, Ebert testified that no client

        would pay $65 per person.  Instead, she would ask the client for 50 names.

        She would then search for the 50 people, determine how much time it took

        to search for each individual, and charge the client according to an hourly

        fee of $65 per hour.  She does this to reduce the costs for the client, who

        will then pay per hour instead of per name.

11.     In one class action case, Ebert performed a search for a law firm for 356

        class members.  She charged between $5,000 and $6,000 and was

        moderately successful.  She was able to locate more individuals after the

social security numbers were produced.

B.     Defendant's Expert, Judith Bronsther ("Bronsther")[4]

1.     Bronsther analyzed plaintiffs' counsel's time records, using a system by which she coded each entry and determined whether it was unreasonable given prevailing billing standards.

2.     Among other problems, Bronsther found that there had been excessive duplication, unnecessary work, and inappropriate delegation.

3.     Bronsther also pointed out specific, repeated, and serious irregularities with the Terris firm's time records.

4.     For example, the firm seeks reimbursement for Wagner's time at the Laffey rate of $370 per hour, but as an out-of-town attorney practicing in Massachusetts, Wagner charges her own clients the substantially lower rate of $140 per hour.  In addition, for her work on the Palmer case, Wagner billed the Terris firm at a rate of $85 per hour.

5.     As for Mozden, the firm initially requested the incorrect rate in the Laffey matrix but later corrected its error.  More problematic, however, is the fact that Mozden was not admitted to the D.C. bar, nor was her application pending, at the time the work was done.

6.     Bronsther testified that Fletcher's hours should not be compensated at all

---

[4] At the hearing, plaintiffs' counsel mentioned that, in a case in the District of Rhode Island, a district court judge found Bronsther's testimony and expert report not to be credible. Whether this is true is irrelevant because: (1) I have performed an independent analysis of the data, and (2) I have only considered those portions of Bronsther's testimony that I find to be both credible and persuasive.

because she was the office manager and her work is overhead.  In addition, Bronsther testified that Fletcher does not qualify as a paralegal as defined by the National Association of Legal Assistants and compensating for her work would be a windfall for the firm, which never expected Fletcher to serve as a profit center who would bill for her time.

7.     Bronsther also opined that Internet searches are below a paralegal task, and Laffey does not contemplate compensating for that level of work.  Instead, Bronsther testified that it should be totally discounted as overhead or compensated at a market rate.

8.     According to Bronsther, between 88 percent and 95 percent of the entries are so vague that the reasonableness of the hours cannot be determined, especially because there is no way of knowing which work should have been performed by a lawyer (*e.g.,* because it involved a substantive conversation with an invitee) and which work could have been performed by a paralegal.

9.     Many of the time slips were organized in the wrong sub-categories.  For example, Ramirez's work in creating and using the database was placed into 4 or 5 different sub-categories.

10.    Another significant problem is that the entries do not accurately reflect the work that was being done.

11.    For example, plaintiffs claim that they billed 360 hours while searching for invitees.  According to Bronsther's coded analysis, however, the firm

17

billed 511.59 hours for this task.

12.    An additional problem is that some of the timekeepers used "formula

billing" in which the same entry was repeated over and over again.

Bronsther opined that this reflects a likelihood that the records were not

kept contemporaneously.

13.    Indeed, some of the time records that were originally blank were later

filled in before presentation to the court.  Many of Ramirez's records, for

example, were filled in one year after the work was performed, and they

were completed by a different timekeeper.  According to Bronsther's

report, 17 entries for which plaintiffs seek compensation were originally

left blank and thus not contemporaneously recorded, and these entries

account for 44.74 hours of billable time.

14.    Bronsther also pointed out that the external evidence (*e.g.,* length and

amount of emails, length of phone calls) do not justify the time recorded in

the time slips.  In her report, Bronsther notes that, for four phone calls,

Wagner billed a total of 60 minutes even though the telephone records

only reflect line charges totaling 14.4 minutes.  Similarly, Terris billed 105

minutes for 6 telephone calls, but the line charges reflect that these calls

lasted a total of 7.60 minutes.  Notably, both Wagner and Terris billed for

this time using a 15-minute billing increment.

15.    Bronsther also testified that, despite Terris' explanation to the contrary, if

a phone call lasted 3 minutes and the timekeeper billed for 15 because it

took an additional 5 to 12 minutes to prepare for the call and memorialize the phone call, then the principal activity was not the phone call, and the time slips should reflect the actual work done.

16.     Bronsther also pointed out various instances in which plaintiffs' counsel submitted inconsistent time journals.  For example, one timekeeper would record an intra-office meeting with another attorney in the firm, but not vice versa.  Even if the other attorney chose not to bill for that time to avoid duplication or excessive billing, the attorney should have recorded the time and designated it as "no charge."

17.     Bronsther also reviewed the search files of several individual women.  In one instance, the firm spent 5 days attempting to locate a woman's correct address (via the work of 4 timekeepers), only to learn that State had already provided plaintiffs with the correct address.

18.     As evidence that the database was futile, Bronsther pointed to 3 emails in which invitees indicated that they had previously told the firm that they had located the correct individuals and they questioned why the firm continued to send letters to their former addresses.

C.     <u>Defendant's Expert, Ward Bower ("Bower")</u>

1.     Bower testified that, generally speaking, tasks such as organizing files and data entry are clerical functions, and clients would probably not expect to pay for them.  Similarly, clients in the D.C. market would not expect to pay for administrative work associated with mailings.

2.    Bower also testified that law firms should delegate work to the lowest competent level at which it can be handled, and clients ought to be charged at the lowest competent level.

3.    Phone calls concerning factual questions about the identity of a person or exam scores are clerical functions or, at the very least, should be handled by a non-lawyer, and clients would be unwilling to pay more than a junior paralegal's rate[5] for such work.  In the same vein, clients would be unwilling to pay more than a junior paralegal rate for non-legal Internet searches such as the Google searches performed in this case, and in fact, such searches may even be a non-compensable clerical function.

4.    On the other hand, conversations with class members in which substantive legal issues are discussed should be handled by a junior attorney.  In addition, lawyers should guide and supervise the performance of the Internet searches.

5.    The prevailing billing increment in the D.C. market is 6 minutes.

6.    As for travel time, practices vary, often in accordance with agreements that have been made with clients.  Some firms bill at their normal rates, but the standard practice is to bill at half the normal rate unless the attorney is working on the case while he or she travels.

---

[5] Although Bower's testimony and analysis differentiated between two levels of paralegal work and corresponding paralegal billing rates, as I stated in the hearing, I will not consider that distinction because Laffey only contemplates one paralegal rate and does not distinguish between levels of paralegals.  Thus, I will consider Bower's testimony only as it concerns four tiers of work: senior attorneys, junior attorneys, paralegals, and clerical work.

7.      In Bower's experience, if hundreds of hours were billed for phone calls,

clients would want to know the subject matter of the calls and to whom the

calls were made.  However, Bower has not analyzed a case, such as this

one, where numerous, short phone calls–often in succession–were made

simply to verify the recipient's identity.

8.      Bower also created a chart, based on a survey of D.C. law firms and the

rates they charge, to demonstrate the prevailing market rates for various

types of work performed by D.C. law firms.[6]

9.      Bower clarified that some paralegal tasks include document numbering,

alphabetizing files, and labeling folders, and that clients pay paralegal rates

for those tasks.

## IV.    LEGAL STANDARDS

Under Title VII of the Civil Rights Act of 1964, district courts may, in their discretion,

award reasonable attorneys' fees to prevailing civil rights litigants. 42 U.S.C. § 2000e-5(k).  The

purpose of this provision is to encourage private litigants to act as "private attorneys general" on

behalf of enforcement of the civil rights laws. Laffey v. Northwest Airlines, Inc., 746 F.2d 4, 11

(D.C. Cir. 1984) (quoting Newman v. Piggie Park Enters., Inc., 390 U.S. 400, 401-02 (1968)),

overruled on other grounds by Save Our Cumberland Mountains, Inc. v. Hodel, 857 F.2d 1516

(D.C. Cir. 1988).

---

[6] As I clarified at the hearing, in accordance with my prior rulings, I will not consider
Bower's chart as a challenge to the Laffey rates.  I will only consider Bower's view as to whether
or not the allocation of responsibilities was appropriate.

In Hensley v. Eckerhart, 461 U.S. 424 (1983), the Supreme Court set forth guidelines for determining a fair attorneys' fee: "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley, 461 U.S. at 434.  To determine the number of "hours reasonably expended," the district court must exclude hours that are "excessive, redundant, or otherwise unnecessary." Id.  Thus, the district court should ensure that the firm seeking the fees exercises "billing judgment" because "[h]ours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." Id. (citing Copeland v. Marshall, 641 F.2d 880, 891 (D. C. Cir. 1980) (emphasis in original)).  The Supreme Court has also noted that a reasonable attorneys' fee is one that is "adequate to attract competent counsel, but . . . [does] not produce windfalls to attorneys." Blum v. Stenson, 354 F.3d 890, 893-94 (1984) (citation omitted).

As the court of appeals has emphasized, in constitutional litigation, successful plaintiffs' counsel are presumed to be entitled to fees for all time reasonably expended, and the obligation to award a fully compensatory fee yields only to "special circumstances [that] would render such an award unjust." Turner v. District of Columbia Bd. of Elections and Ethics, 354 F.3d 890, 895 (D.C. Cir. 2004) (quoting Hensley, 461 U.S. at 429).  In this case, the court is presented with the issue of how to compensate plaintiffs' counsel for work they performed that was a necessary part of the class action lawsuit but was predominantly non-legal in nature.  Plaintiffs' counsel seek Laffey rates for all of the time that the attorneys and paralegals spent on this matter, even though almost none of this work involved complex federal litigation, and the vast majority of the work required absolutely no legal training or skill.

After careful consideration and a review of the evidence presented at the hearing, it is the court's opinion that the fees and costs the Terris firm seeks are not only unreasonable; they are egregious.  The bill is, quite simply, staggering, and it should be seriously reduced according to the principles discussed below.

## V.      ORGANIZATION OF THIS REPORT AND RECOMMENDATION

Before summarizing the reductions, one aspect of this Report and Recommendation must be noted.  While it appears from my discussion and charts that the search and records were clearly organized according to the billing sub-categories, there was actually tremendous confusion among members of the Terris firm as to how they should bill for various types of work.  Accordingly, one member of the firm would bill a certain task under one sub-category while another attorney billed for the same type of work under a different sub-category.  As a result, there is overlap between the sub-categories submitted by plaintiffs' counsel such that some sub-categories capture both search work and substantive work.

Confronted with this situation, I was obliged to impose an organization on a system that was, in fact, disorganized.  In so doing, I have not re-categorized every time slip or decided whether to award compensation for each quarter of an hour billed.  Instead, I have divided my analysis into two sections, one of which focuses on the work performed during the search and one of which focuses on substantive legal work.  I have also recommended an award of fees that are reasonable in light of the case law, the evidence produced at the hearing, and the various controls against which I was able to compare the Terris firm's fees.

In Section VI.A., I discuss the search process employed by the Terris firm and conclude

that the firm is not entitled to compensation at <u>Laffey</u> rates at the attorney level because the work did not involve complex federal litigation and did not require any legal training, skill, or experience.  I also conclude that the search work, apart from the work performed by the office administrator, is not mere overhead and should be compensated at the paralegal level.  I also discuss the unreasonableness of the fees sought in light of various controls and in light of the unnecessary, excessive, and duplicative work performed by the firm.  Finally, I discuss three billing irregularities that clouded plaintiffs' fee petition.  I conclude this section with a chart in which I: (1) strike all hours spent creating and using the database; (2) strike all hours performed by the office administrator; (3) discount all attorney hours to the paralegal level; and (4) discount the fee awarded for the search by 50 percent because of the unnecessary, excessive, and duplicative work performed by the firm and because of the billing irregularities that appear in the time slips.

In Section VI.B., I discuss the hours submitted by the firm for substantive legal work performed in the relevant time period.  In this section, I discuss two issues associated with Wagner's work, in light of the fact that she works in Massachusetts and serves as Of Counsel. For the reasons stated in that section, I discount her travel time and recommend that her hours be compensated at her normal market rate rather than at the <u>Laffey</u> rate.

**VI.    ANALYSIS**

      A.    <u>The Search</u>

            1.    *Results Achieved, Given the Specific Obstacles Presented in This Case*

At the outset, it must be noted that plaintiffs' counsel were extremely successful in

locating the 390 invitees.  It must also be noted that there were several issues that complicated

the search for the invitees.  First, while generalizations are dangerous, individuals interested in

the Foreign Service frequently applied upon graduation from undergraduate or graduate school,

and the addresses they submitted upon taking the examination were out of date soon after they

took the exam.  Second, all of the invitees are women, and while societal mores have changed,

when women marry, they often take their husbands' names or use hyphenated versions of their

maiden and married names.  Third, all of the invitees were interested in international work.  Even

without this complicating factor, in today's fluid society and economy, it is likely that, in the

decade since they took the exams, these women had moved several times.  Finally, over 10 years

had passed and, inevitably, life went on.  Thus, many of the women who had applied to the

Foreign Service were no longer interested in this line of work, and the legal relief to which they

were entitled simply provided little incentive for them to respond to the Terris firm's

correspondence.

The evidence shows that these problems should have been anticipated before plaintiffs'

counsel began the search, or they should have been acknowledged and addressed soon thereafter.

But, instead of stopping the search and seeking bids from outside vendors or discussing the

problems with the government, plaintiffs' counsel chose to charge on and then present their

opponent with an enormous bill once the search was complete.

In addition, the firm apparently had no concept of marginal utility.  Instead, they pressed

forward in their attempts to locate a woman, no matter how long a road they had to travel to

verify that they had, indeed, located the correct invitee.  In many cases, the Terris firm searched

extensively–and unreasonably–before deciding not to pursue a particular woman.  In one

example, an invitee kept denying that she had ever taken the Foreign Service Written Exam, but the firm continued to attempt to verify her identity.  After many searches, the firm finally confirmed that, despite her protestations, she was the woman who in fact took the Foreign Service exam in the early 1990s.  In other examples, members of the Terris firm pursued leads about prize-winning dogs, wineries, and weddings before giving up their quest to locate one of the 390 invitees and turning to the reserve list.  It is within this context that I review the Terris firm's search process and resulting fees.

      2.      *Whether Any Compensation Is Due for the Search Work and, If So, the Rate at Which the Firm Should be Compensated for Time Spent on Non-Legal Tasks*

The award of fees in Title VII cases is based on the premise that counsel should be paid market rates based on what the market pays lawyers for engaging in complex federal litigation.  See Blum, 465 U.S. at 893.  No rational client would pay those rates for lawyers to perform tasks that do not require any of the skill, training, or experience that is involved in complex federal litigation.  Since the market will not pay those rates, the government should not be forced to pay them either.  Indeed, plaintiffs do not even pretend that any of the searching required any legal skills or experience whatsoever.  Surely, no one is suggesting that typing the name "Jane Doe" into Google or another search engine requires a law degree.

In addition, a substantial number of hours were billed by a recent college graduate who had received absolutely no instruction or guidance as to how to perform the search.  Even when Ramirez repeatedly reported that his searches yielded futile results because they produced hundreds of thousands of hits, no one thought to sit down and instruct him how to limit his

searches by, for example, using quotation marks.  Instead, after Ramirez's attempts failed, the

files of the hard-to-locate women were passed around from attorney to attorney, and sometimes

to the office administrator, with each individual making paper notations on the methods he or she

attempted and the results of those efforts.  The attorneys were certainly overqualified to be doing

this type of work.  Simply put, the market would not compensate them to do this type of

searching at the rates they seek, and <u>Laffey</u> does not contemplate awarding legal fees for the type

of Internet searching the attorneys performed in this case.

     With that said, I understand that, when attorneys are compensated according to the <u>Laffey</u>

matrix, not every minute of their time has been spent in complex federal litigation in the sense

that they were taking depositions, authoring briefs, attending hearings or conferences, or trying

their case to a judge or jury.  An attorney's work cannot always be neatly divided such that the

attorney does only substantive legal work and delegates every administrative task–no matter how

minute–to a paralegal or secretary.  For example, an attorney leaving an intra-office meeting with

a partner may, on the way back to her office, walk past a copying machine and decide to make a

copy of a document she was just discussing rather than delegate that task to her secretary.  A

paralegal, having performed classic paralegal duties such as drafting a letter to a client or

citechecking a motion for summary judgment, may also make copies of those documents or send

them in the mail once they have been approved by the supervising lawyer.  In other words, it is

impossible for a reviewing court to draw distinctions this fine and require that every task be

delegated to the lowest competent level, no matter how small the task and no matter the time that

may be wasted in accomplishing such delegation.  In this case, however, the vast majority of the

attorneys' time was devoted to the same tasks that were being performed by a recent college

27

graduate and that could have been performed by anyone who has ever searched the Internet to find a good restaurant or an old friend.  This, in my view, constitutes another situation entirely.

Because of these factors, the firm should not be compensated at attorney rates for doing search work that could have been delegated to a paralegal or secretary.  Since counsel cannot be compensated for the lodestar they seek, the first question is whether they should be compensated at all.  Courts have indicated that they will not compensate attorneys for their overhead, drawing a distinction between non-billable tasks performed by clerical employees and billable tasks done by partners, associates, and paralegals.  The government argues that the search was, at most, administrative overhead for which no compensation is due.  But, it is undisputed that the parties agreed that plaintiffs' counsel would have the responsibility of locating all sub-class members and that they were entitled to reimbursement for $10,000 in out-of-pocket expenses and could seek reimbursement for any additional attorneys' fees and costs.  The government cannot now change the deal it made.  Had it wanted to preclude any and all compensation for the search, it should have so stated in the Consent Decree.  In addition, searching for and contacting invitees surely were not overhead in the sense that rent, electricity, and office supplies are.  Rather, the Terris firm performed a specific, out-of-the-ordinary task in order to fulfill counsel's professional obligations in this class action case.

At the same time, it must be noted that the persons doing the search used generally available search engines such as google.com, yahoo.com, whitepages.com, verizon.com, and switchboard.com.  Using these search engines is so simple that software manufacturers sell programs that will prevent children who are using them from visiting certain sites.  In my view, typing a woman's name into Google, seeing the results, and then deciding how to use them to

28

search further is not like the tasks that paralegals perform, such as citechecking a brief, performing fundamental legal research, or organizing documents so that they can be used for trial or for a brief.  Thus, I am uncomfortable with a compensation scheme that seems to equate work that requires paralegal training and skill with work that does not.

With that said, I am unfortunately back where I started.  Compensating the firm at attorney rates for doing the search work is unacceptable, but the process of locating and verifying the invitees are not mere overhead, unworthy of any compensation at all.[7]  Therefore, it seems that the paralegal level is the closest approximation of the lowest competent level at which the search should have been done.  In making this determination and deciding what ultimate fees should be awarded, I look to the testimony presented at the hearing to determine what fees are reasonable in light of the work done, the results achieved, and the way the market would compensate a firm for this type of work.

---

[7]  This is true except for the work performed by Fletcher, the office administrator.  In Missouri v. Jenkins, 491 U.S. 274 (1989), the Supreme Court ruled that plaintiffs in a successful 42 U.S.C. § 1988 action were entitled, as part of their attorneys' fee award, to reimbursement for the market rate of law clerks and paralegals who had performed work on their case.  However, this Circuit has distinguished between work performed by paralegals and law clerks, on the one hand, and work done by "librarians, clerical personnel and other support staff," on the other because the latter services are generally considered within the overhead component of a lawyer's fee.  In re Olson, 884 F.2d at 1426-27.  In this case, Fletcher billed for 50.1 hours while searching for invitees and communicating with potential invitees to determine whether the firm had located the correct individuals.  She also billed for 1.72 hours while "organizing and analyzing the status of invitees."  While there appears to be an incongruity in denying fees for Fletcher's work when it was similar to work being compensated at the paralegal level, it must be remembered that: (1) Fletcher was never expected to be a profit center and does not normally bill for her time; and (2) she performed this work only when plaintiffs' counsel realized that their search deadline was fast-approaching.  To award the firm fees for work done by clerical personnel would be a windfall to the firm and is not justified by the case law.  Accordingly, I will strike all of the hours submitted for Fletcher's work.

<u>      </u>      3.     *Cost of the Terris Firm's Search as Compared to Other Controls*

As explained in one of my earlier opinions, the Consent Decree stated that the government would reimburse the Terris firm up to $10,000 for out-of-pocket expenses actually incurred in locating the 390 invitees.  Yet, plaintiffs' counsel never explored whether there were any vendors willing to perform the search for that sum or any other pre-determined amount. Instead, Adams, a junior associate who had a single experience searching for class members, recommended that hiring a third party to conduct the search would be too expensive.  As a result, the firm decided that it would locate and verify the identity of all of the invitees.

Unfortunately, the miscalculation was Titanic.  In the interest of "saving money," the firm spent between $81,035.70 and $119,972.70 of what it hopes will be the government's money to find the sub-class members.

As demonstrated by the charts below, the larger sum of  $119,972.70 includes time spent on the following tasks: creating and using the database, organizing and analyzing the status of invitees, searching for invitees, and communicating with class members and invitees.  According to this formula, the Terris firm charged the government an average of $307.62 for each of the 390 invitees for whom they searched.

As explained at the hearing, the purpose of many of the communications with sub-class members was to verify that the correct individuals had been located, while other conversations were more substantive.  Again, it is impossible to know, based on the time slips and evidence presented at the hearing, which of these conversations were substantive and which were not. Therefore, it is impossible to know which of these communications were part of the search

process and which were not.  Even if all of the communications with class members and invitees were excluded from the cost of the search because they were substantive in nature (and would have had to have been performed regardless of the search process itself), plaintiffs' counsel charged a total of $81,035.70 for the search.   According to this formula, the Terris firm charged the government an average of $207.78 per person for the search.

TOTAL FEES INCURRED IN THE SEARCH
(including communications with invitees and non-invitees):
$119,972.70 ($307.62 per name)

| TASK | Terris $370 | Wagner $370 | Adams $265 | Mozden $175 | Paralegals $100 |
|------|------|------|------|------|------|
| Communications with Non-Invitees | | 17.00 | 38.25 | | 2.46 |
| Communications with Invitees | | 15.75 | 26.00 | 0.63 | 94.37 |
| Creating and Using Database | | | 2.33 | | 68.40 |
| Organization/Analysis of Status of Invitees | | 0.50 | 79.80 | 1.05 | 100.46 |
| Searching for Invitees | 1.00 | 0.50 | 8.75 | 55.57 | 294.18 |
| SUBTOTALS (HOURS) | 1.00 | 33.75 | 155.13 | 57.25 | 559.87 |
| SUBTOTALS (FEES) | $370 | $12,487.50 | $41,109.45 | $10,018.75 | $55,987.00 |

TOTAL FEES INCURRED IN THE SEARCH
(excluding communications with invitees and non-invitees):
$81,035.70 ($207.78 per name)

| TASK | Terris $370 | Wagner $370 | Adams $265 | Mozden $175 | Paralegals $100 |
|------|------|------|------|------|------|
| Creating and Using Database | | | 2.33 | | 68.40 |
| Organization/Analysis of Status of Invitees | | 0.50 | 79.80 | 1.05 | 100.46 |
| Searching for Invitees | 1.00 | 0.50 | 8.75 | 55.57 | 294.18 |
| SUBTOTALS (HOURS) | 1.00 | 1.00 | 90.88 | 56.62 | 463.04 |
| SUBTOTALS (FEES) | $370 | $370 | $24,083.20 | $9,908.50 | $46,304.00 |

These figures are outrageous, especially in light of the testimony of Ebert, a thoroughly credible witness *produced by plaintiffs.*  Ebert testified that, under her normal fee schedule, she

charges a flat fee of $65 per search.  But, if a client were searching for a large group of people,

Ebert testified that no client would pay $65 per person.  Instead, she would ask the client for 50

names.  She would then search for the 50 people, determine how much time it took to search for

each individual, and charge the client according to an hourly fee of $65 per hour.  She does this

to reduce the costs for the client, who will then pay per hour instead of per name.

Thus, Ebert's testimony indicates that she could have performed the search for a fraction

of what plaintiffs' counsel seek.  Indeed, Ebert charged another law firm approximately $5,000 or

$6,000 when she searched for 356 class members, and the search produced moderate results.  It is

reasonable to conclude that, had the Terris firm hired her, Ebert's search would have cost roughly

$6,000, or $15.38 per name, and produced similar results.

Understandably, the Terris firm would not have been satisfied with moderate results

because: (1) under the Consent Decree, the firm had the obligation of notifying these women of

the existence of the lawsuit, the terms of the Consent Decree, and their legal rights under the

agreement; and (2) if plaintiffs' counsel failed to locate and notify an invitee of the relief counsel

had secured on behalf of the plaintiff class, she would lose her legal right to participate in the

Oral Assessment.  Still, even if the firm had insisted that Ebert triple the efforts she made when

searching for members in a different class action suit and had incurred a bill of $18,000 rather

that $6,000, the search would have only cost $46.15 per name.

Finally, even if the Terris firm had hired Ebert and instructed her to pursue every possible

lead, throwing the concept of marginal utility to the wind as they did when they performed the

search in-house, her fee still would not have come close to the fees plaintiffs have submitted to

the government.  As demonstrated by the following chart, if Ebert had used all of the resources at

her disposal and charged the government $65 per name at the first two levels of the search and

$200 per name at the final stage, Ebert would have successfully located 370 individuals for the

grand total of $42,390.00, or $108.69 per name.

| | COST PER PERSON | COST OF SEARCH | # INVITEES FOUND | # INVITEES LEFT |
|---|---|---|---|---|
| Initial search for 390 (with a 65% success rate) | $65 | 25,350 | 254 | 136 |
| Follow-up search for 136 (with a 70% success rate) | $65 | 8,840 | 95 | 41 |
| Follow-up search for 41 (with a 50% success rate) | $200 | 8,200 | 21 | 20 |
| TOTALS | | $42,390 | 370 | |

It bears emphasis that this calculation is *substantially* higher than Ebert would ever actually

charge, but the court has no way of calculating a bulk rate for the initial search for the 390

invitees and no way of estimating how many hours Ebert would have spent doing the follow-up

search (which she performs at an hourly rate).  Accordingly, this calculation results in an

extremely generous estimate of what such a search could cost.[8]  Still, even if Ebert conducted the

search and charged the firm according to this adapted fee schedule, the cost still would have been

tens of thousands of dollars less than the fees the firm incurred by performing the search in-

house.

The resulting irony is obvious: plaintiffs produced a witness apparently to show that the

Terris firm's search process was reasonable, but her testimony instead helped establish how

---

[8]  I recognize that these figures do not include the expense of actually contacting each of
the invitees and confirming her identity.  However, this calculation does demonstrate that
plaintiffs' counsel could have saved tens of thousands of dollars on the search process had they
thought to employ the services of a third-party vendor.

unreasonable it was.  The outrageousness of plaintiffs' search fees is demonstrated by the following chart:

| SEARCH METHOD | COST OF SEARCH | COST PER PERSON |
|---|---|---|
| Terris Firm Search (including communications with invitees and non-invitees) | $119,972.70 | $307.62 |
| Terris Firm Search (excluding communications with invitees and non-invitees) | $81,035.70 | $207.78 |
| Ebert Search (comparable to the search she performed in another class action lawsuit) | $6,000 | $15.38 |
| Ebert Search (tripling what she charged in another class action lawsuit) | $18,000 | $46.15 |
| Ebert Search (pursuing every possible lead and charging $65 per name at the first two levels of search and $200 per name at the final level of search) | $42,390 | $108.69 |

4.      *Unnecessary, Excessive, and Duplicative Work*

_____When reviewing the fees charged by the Terris firm against these controls, it is readily apparent that the fees were outrageous.  This comparison inspires the question: how did the Terris firm generate such exorbitant fees while doing non-legal tasks?  One element of determining whether attorneys' fees are fair and reasonable is looking at whether any of the work was "excessive, redundant, or otherwise unnecessary." Hensley, 461 U.S. at 431.  As demonstrated at the hearing, the search methodology employed by plaintiffs' counsel–if it can be called a methodology at all–was entirely *unreasonable*.  Conceived by a junior-level associate with only one prior experience searching for class members, the Terris firm's plan was problematic from the start.  As Bronsther testified: "There was no best practices.  There was no methodology.  Everyone was left to their [*sic*] own devices to search in whatever creative way

34

they [*sic*] could." Aug. 20, morning session, at 79.[9]

For example, even though they were armed with the social security number and date of birth of each invitee–data that would not change no matter how many times a woman moved around the country or the world and no matter how many times she changed her name–the Terris firm failed to use this valuable information as part of the first step in searching for each sub-class member.  Instead, they searched in Lexis and on the Internet using each woman's name, sometimes placing the name in quotes and sometimes not.  Failing to use the unique personal information they had in hand was unquestionably unreasonable and inefficient, and plaintiffs should have known that from the start.

In addition, the paper search files of various invitees reveal that the Terris firm went on "wild goose chases," seeking to find any and all leads that would help them find the women for whom they were searching.  As Bronsther testified: "[M]ost of the search files I reviewed were a comedy of errors." Aug. 20, morning session, at 77.[10]  As indicated previously, in some cases, the firm followed up on leads in which invitees' names were connected with weddings, wineries, kennel clubs, prize-winning dogs, and even goats.  In one instance, four separate timekeepers worked on one woman's file, attempting to locate her correct contact information, only to learn that State had already provided plaintiffs with the invitee's correct address.  In other cases, a few women contacted the Terris firm, questioning why they continued to receive letters addressed to

---

[9] This portion of the testimony is sealed, but the quoted remarks do not reveal any confidential information.

[10] This portion of the testimony is sealed, but the quoted remarks do not reveal any confidential information.

their former addresses when they had already contacted the firm and notified it of their current
addresses.

In addition to all of these misadventures, it appears that the entire process of creating and
using a database to document the search progress was entirely futile.  Indeed, the database was
used to capture only *some* of the information obtained by various members of the Terris firm, and
it was inconsistently and only selectively updated.  As a result, plaintiffs' counsel actually created
more work for themselves–not less–and thus generated higher fees.  Indeed, even after writing
off many hours spent building the database because the hours were unnecessary, the firm's
revised bill still includes over 70 hours under the sub-category "Creating and Using the
Database."

>    5.    *Billing Irregularities*

Apart from problems with the search process itself, irregularities in the Terris firm's
billing records provide further justification for a reduction in fees.

Plaintiffs may satisfy their burden of demonstrating that the number of hours expended on
certain tasks was reasonable by submitting invoices that are "sufficiently detailed to permit the
District Court to make an independent determination whether or not the hours claimed are
justified." Nat'l Ass'n of Concerned Veterans v. Sec'y of Def., 675 F.2d 1327 (D.C. Cir. 1982).
See also Cobell v. Norton, 231 F. Supp. 2d 295, 305 (D.D.C. 2002).  To be sufficient, the
invoices "need not present 'the exact number of minutes spent nor the precise activity to which
each hour was devoted nor the specific attainments of each attorney.'" Concerned Veterans, 675
F.2d at 1327 (quoting Copeland, 641 F.2d at 891).  However, if "'multitudinous billing entries'

36

. . . wholly fail to state or to make any reference to the subject discussed at a conference, meeting or telephone conference," the court may reduce the fees sought.  In re Olson, 884 F.2d 1415, 1428 (D.C. Cir. 1989).

In my view, plaintiffs' counsel should not be held to a standard by which they must record the specifics about every transaction, communication, or research or writing project they undertake.  But, I specifically ordered them to produce evidence of what, in fact, the lawyers did in the sub-categories of work they specified, and why that work required a lawyer's training and skill.  After presiding over an evidentiary hearing for four days and reviewing the transcript as well as five notebooks of exhibits, I still do not know exactly what the attorneys, paralegal, and office manager did with respect to each of their time records.  I know, generally speaking, how the search was conducted and, generally speaking, who performed what functions.  But, I cannot say that the time records or the evidence produced to explain them is sufficiently detailed to allow the court to determine whether the hours claimed are justified.  See Concerned Veterans., 675 F.2d at 1327.  Nor do I know why some of the same work was performed by paralegals and attorneys, except that the first Internet searches were futile and therefore other members of the firm tried their hands at searching the Web when they had time.

In addition to problems of vagueness, two of plaintiffs' counsel, Terris and Wagner,[11] billed according to a 15-minute billing increment.  As both Bronsther and Bower testified, the 15-minute billing increment is a standard that used to be acceptable but has, over the past decade and a half, fallen out of favor.  In addition, while Terris' and Wagner's billing records reflected

---

[11] The court notes that Terris only billed 1.00 hour of time for search work, but Wagner billed 33.75 hours for time spent related to the search.

the use of 15-minute billing increments, their records do not reflect that they wrote off any work

if they spent less than 7 ½ minutes on a matter, as Terris explained was his practice.  Therefore, it

appears that, by using the 15-minute billing increment, some of plaintiffs' counsel billed for time

that they did not spend working on the case.

Finally, fee petition applicants must submit contemporaneous time records of hours

worked and rates claimed that sufficiently document the services rendered.  In re Olson, 884 F.2d

at 1428.  In this case, however, there were several instances in which the firm's original slip

details were produced in blank format and later filled in to reflect the type of work performed

during each billing entry.  Surely, these time records were not contemporaneously kept.  In

addition, other time records included the same description for each time entry, a practice known

as formula billing, which also tends to indicate that the records were not contemporaneously kept

as the work was being performed.

6.       *Fees Awarded for the Search*

For all of the reasons stated above, I recommend that the fees related to the search process

be reduced to $34,222.50.  The following chart demonstrates how I arrived at this amount.  First,

in the sub-category of "Creating and Using the Database," I have stricken all of the time sought

by plaintiffs because the database was completely futile.  In all of the other sub-categories that

capture work related to the search process, I have stricken all hours performed by attorneys, but I

recommend that those hours be compensated at the Laffey rate applicable to paralegal work.  It

should be noted that I compensated work spent organizing and analyzing the status of invitees at

the paralegal level and did not discount it as clerical work or overhead because the detailed time

slips reveal that much of the time billed to this sub-category was actually spent searching for invitees or communicating with them.  For these reasons, in the paralegal column, I have added together the total number of hours spent in each sub-category by all members of the Terris firm, less the number of hours submitted by Fletcher, the office administrator.  Finally, I have reduced the total amount of fees awarded to plaintiffs' counsel by 50 percent because of the duplicative, unnecessary, and excessive work involved in the entire search process and because of the billing irregularities identified above.

**TOTAL FEES FOR SEARCH WORK (AFTER 50% REDUCTION) = $ 34,222.50**

| TASK | Terris $370 | Wagner $370 | Adams $265 | Mozden $175 | Paralegals $100 |
|---|---|---|---|---|---|
| Communications with Non-Invitees | | 17.00 | 38.25 | | 2.46 **57.71** |
| Communications with Invitees | | 15.75 | 26.00 | 0.63 | 94.37 **136.75** |
| Creating and Using Database | | | 2.33 | | 68.40 |
| Organization/Analysis of Status of Invitees | | 0.50 | 79.80 | 1.05 | 100.46 **180.09**[12] |
| Searching for Invitees | 1.00 | 0.50 | 8.75 | 55.57 | 294.18 **309.90**[13] |
| SUBTOTALS (HOURS) | 0 | 0 | 0 | 0 | **684.45** |
| SUBTOTALS (FEES) | 0 | 0 | 0 | 0 | $68,445.00 |
| 50% REDUCTION | | | | | $34,222.50 |

---

[12] This number reflects the aggregate of all hours spent working on the "organization and analysis of status of invitees," whether the work was performed by attorneys or paralegals, and it discounts that total number by 1.72 hours, which were performed by Fletcher, the office administrator.

[13] This number reflects the aggregate of all hours spent "searching for invitees," whether the work was performed by attorneys or paralegals, and it discounts that total number by 50.1 hours, which were performed by Fletcher, the office administrator.

B.     Time Records Reflecting Substantive Legal Work

_____Although the lion's share of the work was clearly devoted to the search process, the Terris

firm also performed substantive legal work in the relevant time period.  Again, there is overlap

between the records reflecting substantive legal work and search work, and I have not re-coded

all of the time slips, nor do I recommend reductions on an entry-by-entry basis.  Instead, I have

identified two issues that require a reduction in the lodestar the Terris firm seeks for the

substantive legal work it performed.

1.     *Rate at Which Former Member of the Firm, Serving as Of Counsel,*
       *Should Be Compensated*

As stated in my earlier opinions and at the hearing, I am not considering whether the

Terris firm is entitled to Laffey rates provided that the work that each attorney or paralegal

performed was reasonably delegated or assigned to that attorney or paralegal and the time slips

reflect the work that was actually performed.  However, as stated above, there is a special

circumstance of which I was unaware before the evidentiary hearing.  Wagner, a former member

of the Terris firm, left the firm, moved to Massachusetts, and now serves as Of Counsel.  The

firm seeks compensation for Wagner's time at full Laffey rates.  However, Wagner charges the

firm at a rate of $85 per hour for her work.  She also charges her own Massachusetts clients $140

per hour, a rate which presumably reflects her local market rate because it is paid by her clients.

In Donnell v. United States, 682 F.2d 240, 251-52 (D.C. Cir.1982), the court of appeals

awarded D.C. rates to three Mississippi lawyers who handled a voting rights case, including trial,

in this circuit, even though much of the preparation work was performed in Mississippi. Donnell,

682 F.2d at 252.  As to the fourth Mississippi attorney who "was hired for his particular

expertise," the court found that "his function could not have been duplicated by an attorney from

the District of Columbia." Id.  It therefore concluded that his proper hourly rate was the

prevailing market rate in Mississippi. Id.

Citing Donnell, the court of appeals explained: "Assuming the normal rule is that the rate

is based on the forum of the litigation, not the business location of the lawyers, we recognized

that the rule has an exception--when an out-of-town attorney is used because of special expertise

or the unwillingness of local counsel to take the case, out-of-town rates apply; as long as local

attorneys are available and competent to handle the case, however, local rates should prevail."

Davis Cty. Solid Waste Mgmt., Etc. v. EPA, 169 F.3d 755, 758 (D.C. Cir. 1999) (citing Donnell,

682 F.2d at 251-52; Nat'l Wildlife Fed'n v. Hanson, 859 F.2d 313, 317-18 (4th Cir.1988); In re

"Agent Orange" Prod. Liab. Litig., 818 F.2d 226, 232 (2d Cir.1987)).  In Davis County, however,

the court of appeals recognized that the situation at bar was unlike Donnell because

out-of-jurisdiction lawyers would receive substantially higher rates than they ordinarily command

for work done almost exclusively in their home territory.  Id.  Thus, the court created a second

exception to Donnell for cases where the bulk of the work is done outside the jurisdiction of the

court and where there is a very significant difference in compensation favoring the District. Id.

The new rule "would prevent the occasional erratic result where the successful petitioner is vastly

overcompensated given the amount he contracted to pay for legal services." Id.  Thus, the court

found it justified to "award[] fees based on rates charged in the District of Columbia to all

lawyers *except those few who practice in far less expensive legal markets and perform the bulk of

their work on the case at home in those markets*." Id. (emphasis added and citations omitted).

The court summarized that it would "presume that Washington rates will apply so long as the judicial forum is here, unless the work done here is minimal and the difference in rates substantial." Id.

In this case, Wagner's services were enlisted because of her expertise and experience with the Palmer litigation, which suggests, according to Donnell, that she should be compensated at her out-of-town rates.  Even if that were not the case, it is also true that Wagner billed for a total of 100.75 hours, 21.25 of which were spent preparing for, traveling to, or attending the Fairness Hearing in the United States District Court for the District of Columbia.  Because the great majority of Wagner's time was spent working on this case in Massachusetts, and because the difference in the rate she charges her clients ($140 per hour) and the rate the Terris firm seeks for her work ($370 per hour) is substantial, I will follow Davis County and recommend that her work be compensated at the lower rate of $140 per hour.

2.    *Travel Time*

In addition, plaintiffs billed for certain fees and expenses, such as time billed for Wagner's travel, that were incurred solely because Wagner lives in Massachusetts.  As stated by Bower and Bronsther, it is standard practice for attorneys to bill at half of their rates when they are billing for pure travel time, unless they had a different agreement with their clients or they spent the travel time performing substantive work for the case.  Because there is no evidence that either of these conditions apply, I will discount Wagner's travel time by 50 percent.

3.    *Reduction of Lodestar Because of Wagner's Time*

In light of the issues discussed above, I have discounted Wagner's rate to $140 per hour

42

Case 1:76-cv-01439-HHK   Document 649   Filed 07/11/05   Page 43 of 45


and have reduced by half the time she billed for traveling.  I have not discounted for any other time spent on substantive legal work.  It should be noted that some of the substantive legal work billed to the category of "Intra-Office Communications," especially the hours that Adams billed to this category, concerned the progress of the search, but I have not discounted those hours because the attorneys had to spend some time supervising the search for invitees.

The award of attorneys's fees for substantive legal work and the award of expenses are summarized in the following charts:

**TOTAL FEES FOR LEGAL WORK (AFTER REDUCTION OF WAGNER'S TIME) = $17,713.85**

| TASK | Terris $370 | Wagner ~~$370~~ $140 | Adams $265 | Mozden $175 | Paralegals $100 |
|------|------|------|------|------|------|
| Settlement Negotiations | 1.25 | 1.25 | | | |
| Preparation of the Consent Decree | | 9.50 | | | |
| Communications with Named Plaintiffs | | 1.25 | | | |
| Intra-Office Communications | 4.75 | 14.00 | 20.57 | | |
| Communications with State | | 15.00 | 0.77 | | |
| Fairness Hearing | 1.00 | ~~21.25~~ 17.25 | 1.75 | | |
| Protective Order | 0.50 | 3.50 | | | |
| Communications with Court | | 1.25 | | | |
| SUBTOTALS (HOURS) | 7.5 | 63 | 23.09 | 0 | 0 |
| SUBTOTALS (FEES) | $2,775.00 | $8,820.00 | $6,118.85 | 0 | 0 |

**TOTAL EXPENSES AWARDED BY THE COURT:  $25,354.42**

| | |
|---|---|
| Facsimile Transmissions | $254.00 |
| Web-Based Search Fees | $237.80 |
| Photocopying (External) | $16,698.22 |
| Photocopying (In-House) | $1,909.66 |
| Postage | $5,598.77 |
| Lexis | $272.84 |
| Local Travel | $17.00 |
| Messenger Delivery Fees | $25.90 |
| Overnight Delivery Charges | $64.01 |
| Telephone | $276.22 |
| TOTAL EXPENSES | $25,354.42 |

## VII.    CONCLUSION

_____In conclusion, I must emphasize that the process by which the Terris firm performed the search for invitees and billed the government for the work has been deeply troubling.  This fee litigation has, unfortunately, caused the parties and the court to expend an enormous amount of time and resources litigating and resolving the issue of what a reasonable fee is for the work performed in the relevant time period.  The firm's failure to seek out a reasonable method for proceeding with the search and its failure to keep adequate records provide additional justification for the reductions I have made, especially in light of the Supreme Court's admonition that "[a] request for attorney's fees should not result in a second major litigation." Hensley, 461 U.S. at 437.

Accordingly, and for the reasons explained above, I recommend that this court order State

44

to pay the Terris firm a total of a total of $77,290.77, which includes $51,936.35 for attorneys'

fees ($34,222.50 for the search and $17,713.85 for substantive legal work) and $25,354.42 for

expenses incurred in the period from February 1, 2002 to January 14, 2003.

**Failure to file timely objections to the findings and recommendations set forth in**
**this report may waive your right of appeal from an order of the District Court adopting**
**such findings and recommendations. See Thomas v. Arn, 474 U.S. 140 (1985).**


_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

Dated:

45